# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MICHAEL YOUNG, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 3:03cv1161 (PCD) |
| | : | |
| PITNEY BOWES, INC., PITNEY | : | |
| BOWES OFFICE SYSTEMS, INC. and | : | |
| IMAGISTICS INTERNATIONAL INC., | : | |
| a/k/a IMAGISTICS, INC., | : | |
| Defendants. | : | |

## RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff brings this action pro se, alleging violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, et seq., and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §§ 46a-60, et seq. Defendants move for summary judgment, arguing that none of Plaintiff's claims give rise to a triable issue of material fact and that his discriminatory demotion claim and his retaliation claim are unsustainable as a matter of law. For the reasons stated herein, Defendants' Motion for Summary Judgment [Doc. No. 34] is **granted+**.

## I. LOCAL RULE 56(a) STATEMENT & MOTION TO COMPEL

Plaintiff did not file a Local Rule 56(a)(2) statement as the Local Rules require parties to do when opposing a motion for summary judgment. He explains that he will file the requisite statement "once information and material facts requested of the defendant are in hand," asking the Court to grant his "pending" Motion to Compel. The Motion to Compel referenced by Plaintiff, however, has not been filed with the Court. He attaches it as an exhibit to his January 20, 2006 Response to Defendants' Motion for Summary Judgment, but fails to include

Defendants' Opposition thereto.  <u>See</u> Pl's Response at Exh. 2; Defs' Certification of Compliance [Doc. No. 40] (certifying that on May 6, 2005, in compliance with this Court's Supplemental Order, Defendants timely served on Plaintiff their Memorandum of Law in Opposition to his Motion to Compel).  This Court is not authorized to rule on a motion that has not been filed; therefore, the Motion to Compel or Motion for Extension of Time referenced by Plaintiff are not here decided.

Even if the motion had been filed, however, the Motion to Compel attached as Exhibit 2 to Plaintiff's Response to Defendants' Motion for Summary Judgment is deficient and could not be ruled on because it does not provide the Interrogatories at issue, Defendants' objections to the Interrogatories, Defendants' Memorandum in Opposition to the Motion to Compel or an affidavit pursuant to Rule 56(f) of the Federal Rules of Civil Procedure.[1]  Without such information, this Court would be unable to come to a decision on the merits.  Moreover, Motions for Extensions of Time filed by Plaintiff have been considered and ruled on twice by this Court.  Plaintiff originally filed motions seeking to extend the pretrial deadlines for ninety days and sixty days on March 31, 2005 and April, 14, 2005 respectively.  Both motions were denied.  In denying the first, the Court said that "[i]n reference to plaintiff's pro se status, a short additional period for discovery will be considered with any motion to compel filed by 4/15/05."  In denying the second, the Court said "absent a filed Motion to Compel, this extension will not advance the case." Plaintiff never filed a Motion to Compel and has not taken steps to reasonably move this matter towards disposition.

---

[1]    A party requesting discovery pursuant to Rule 56(f) must file an affidavit describing: "(1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful."  <u>Gualandi v. Adams</u>, 385 F.3d 236, 244 (2d Cir. 2004) (citing <u>Hudson River Sloop Clearwater, Inc. v. Dep't of the Navy</u>, 891 F.2d 414, 422 (2d Cir. 1989)).

Defendants argue in their Reply Memorandum that due to Plaintiff's failure to submit a counter-statement of disputed facts pursuant to Local Rule 56(a)(2), the Court should deem admitted all material facts set forth in their Local Rule 56(a)(1) statement and supported by the evidence.  See Defs' Reply at 1-2 (citing D. Conn. L. R. 56(a)).  Although Defendants are technically correct, this Court will accord Plaintiff additional deference in light of his pro se status.[2]  If, based on allegations in Plaintiff's complaint that could reasonably be within his personal knowledge, a question of fact appears, the Court will credit Plaintiff's allegation. This Court will not, however, credit Plaintiff's statements and/or assumptions that are not supported by the evidence and which could not logically be within his personal knowledge as Plaintiff has been given numerous opportunities to obtain information and the Court has explicitly suggested that he take action to do so.  Although this Court certainly would not sanction Defendants unreasonably withholding documents and information that Plaintiff is entitled to receive, Defendants should not be penalized for or forced to defend a suit that may have no merit based on Plaintiff's failure to attempt to obtain the information necessary to prove his case, even in light of the extra deference that he is accorded.  Because Plaintiff did not take advantage of the available opportunities to seek additional discovery, he cannot now claim that discovery was inadequate.  See New York State Teamsters Conf. Pension & Ret. Fund v. Express Services, Inc., 426 F.3d 640, 648 (2d Cir. 2005) (holding that "a party's failure to seek discovery under Rule

---

[2]     Plaintiff is entitled to special deference on both substantive and procedural matters in light of his pro se status.  In Haines v. Kerner, the Supreme Court instructed lower courts to hold the allegations of pro se plaintiffs' complaints to "less stringent standards than formal pleadings drafted by lawyers." 404 U.S. at 520; see also Green v. United States, 260 F.3d 78, 83 (2d Cir. 2001) ("It is well settled that pro se litigants generally are entitled to a liberal construction of their pleadings, which should be read to raise the strongest arguments that they suggest.") (internal citations omitted). Similarly, the Second Circuit requires district courts to grant pro se plaintiffs special leniency on procedural matters.  See Lucas v. Miles, 84 F.3d 532, 535 (2d Cir. 1996).

56(f) [of the Federal Rules of Civil Procedure] before responding to a summary judgment motion is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate") (internal quotations and citations omitted).

Accordingly, this Court will deal with the Motion for Summary Judgment on the basis of the record at hand.  Any compromise of Plaintiff's ability to contest the motion is the result of his own failure to take advantage of opportunities clearly made available and pointed out to him in several of this Court's orders.  The evidence submitted to the court reflects the following material facts.

## II.  BACKGROUND

Defendants filed the instant Motion for Summary Judgment on March 28, 2005.  Plaintiff failed to file a timely response, however, on January 12, 2006, in deference to Plaintiff's pro se status, this Court issued an Order to Show Cause, directing Plaintiff to file a Memorandum in Opposition to Defendants' Motion on or before January 25, 2006.  In compliance with that Order, Plaintiff filed his Response to Defendants' Motion on January 20, 2006.

Because this case is at the summary judgment stage, this Court views the record in the light most favorable to Plaintiff, the non-moving party.  See Terry v. Ashcroft, 336 F.3d 128, 139 (2d Cir. 2003).  Some of the facts are undisputed.  Plaintiff was born January 23, 1952.  Currently fifty-four years old, he was forty-eight when the alleged discrimination began and fifty-one when his employment was terminated.  See Pl's Mem. Opp. Mot. Summ. Judg. ("Pl's Opp.") at 5.  Plaintiff began his employment at Imagistics International, Inc., formerly known as Pitney Bowes Office Systems, Inc., ("Imagistics") as a Sales Representative in 1982.  In 1998, Plaintiff took over as Branch Manager for the Hartford sales office, one of six branches making up the

4

Northeast Region.

Plaintiff states that the Hartford branch "prospered" under his direction, with 1998 showing a forty-four percent increase in sales over the prior year.  See Pl's Opp. at 6 (citing Pl's Exh. 5, showing a chart of all Northeast Region office which indicates that the Hartford branch had the greatest percentage increase in sales over the prior year and moved from tenth out of eleven offices in total revenue in 1997 to eighth out of eleven in 1998).  Plaintiff contends that his achievements were "showcased" in a November 1998 Gallup Workplace Audit in which the Hartford branch scored "well above" the division and national sales organizations in several leadership and workplace satisfaction categories.  See id. (citing Pl's Exh. 6, showing Plaintiff with a mean score of 3.87, as compared to a national average of 3.64).  Plaintiff also asserts that in 1999, the Hartford branch continued to prosper, posting a twenty-one percent revenue growth which made 1999 a "record year" for the branch.  Id.  Plaintiff maintains that due to his strong performance, he was on top of Sandy Navin's—then his Regional Vice President—"short list" to take her position as Regional Vice President if she obtained a promotion as expected.  Id. (citing Pl's Exh. 7, showing a 21 percent increase in revenue from 1998 to 1999 but also showing only a 26.8 percent, rather than the previously alleged 44.4 percent, increase in revenue from 1997 to 1998.  1997 had the lowest revenues for the Hartford branch during the five-year period from 1995 through 1999).

On July 13, 2000, John Yerganian, then the Regional Sales Vice President for the Northeast Region, issued Plaintiff a disciplinary warning based on the "deplorably low levels of production" in the Hartford Branch.  See Defs' Mem. Supp. Mot. Summ. Judg. ("Defs' Mem.") at 3.  The memo addresses performance problems in the Hartford Branch and notes that the

5

branch's year-to-date attainment for 2000 was only at twenty-three percent of sales volume quota and twenty-four percent of margin quota.  See 7/13/00 memo, Peikes Aff. at Exh. B.  Yerganian stated that Plaintiff's performance level "is the lowest in [his] peer group and is unacceptable" and gave Plaintiff escalating monthly sales targets of eighty percent of quota for July and ninety percent of quota for August.  Id.  Yerganian also noted that Plaintiff had continually failed to meet the deadlines for submitting monthly reports since he (Yerganian) took over as Vice President and warned Plaintiff that future "tardiness" or failure to achieve the outlined performance levels "will result in disciplinary action, up to and including termination."  Id.

Plaintiff concedes that his performance at this time was not up to par, but argues that the low performance levels were due to a "personnel matter" in the Hartford branch.  Specifically, Plaintiff alleges that in the Second Quarter of 1999, he discovered "questionable ethical behavior" on the part of his subordinate Area Sales Manager ("ASM"), Barney Kalman, and issued a strict warning to him about the impropriety of his behavior and reminding him to maintain company business practice standards.  See Pl's Opp. at 6; see also Pl's Exh. 8 (warning letter from Plaintiff to Kalman discussing the alleged ethical improprieties).  According to Plaintiff, another incident involving Kalman occurred later that year and Kalman was terminated in November of 1999.  See id. For the first three quarters of 2000, therefore, Plaintiff alleges that he and Kalman's replacement as ASM, Brian Correll, spent a great deal of time attempting to rectify the problems created by Kalman's ethical improprieties.  Plaintiff cites this "preoccupation" as the primary reason that the Hartford branch performed poorly during the first half of 2000.  See id. at 7.

Nonetheless, Plaintiff responded to Yerganian's disciplinary warning by devising an

6

"Action Plan" to remedy the situation.  See id.  Plaintiff's "Action Plan" was outlined in a July 20, 2000 memo in which he set monthly goals for the remainder of 2000, establishing a sold revenue target of $66,667 per month and a total revenue target of $95,833 per month.  See Pl's Exh. 9.   Plaintiff claims that one of the "highest impact actions," made at Mr. Yerganian's suggestion, involved Plaintiff moving his office to the sales floor of the building where he could directly monitor, supervise and direct his staff.  Id.  As evidence, Plaintiff cites Exhibit 11, which he claims shows results taken directly from order status reports from September 2000 through June 2001.[3]  During this period, Plaintiff was responsible for $110,000 or less in monthly revenue, however, he claims to have exceeded that figure by more than 104 percent during that period.  See id.

Chris Clark subsequently replaced Yerganian as the Vice President for the Northeast Region.  On September 12, 2000, Clark issued a follow-up memorandum to Plaintiff regarding the Hartford Branch's performance.  This memorandum notes that performance in the Hartford Branch declined following Yerganian's disciplinary warning, however, Clark reduced Plaintiff's minimum quota even further for September, October and November in a purported effort to eventually "get Hartford to 100% each month."  9/12/00 memo, Peikes Aff. at Exh. B.[4]

Plaintiff alleges that the "quota decreases" that Clark gave him were actually disguised

---

[3]      Exhibit 11 is a handwritten, difficult to decipher document.  The Court is unable to assess whether it supports Plaintiff's claims in this regard.

[4]      In the memo, Clark reduces Plaintiff's sold margin/total margin quotas to $50,000/$75,000 for the three months listed, noting that this is "in line with an ASM quota and you have an ASM in place." 9/12/00 memo, Peikes Aff. at Exh. B.  Defendants, in an effort to put these quotas in perspective, explain that "production" for the Hartford Branch is equal to the total volume produced by the entire sales team in that office and the quotas that Clark put in place were equal to those that could be achieved with "adequate productivity" by a single ASM.  Defs' Mem. at 5 n.3 (citing Pl's Depo. at 167-68).

quota increases, claiming that Clark's memorandum fails to acknowledge that the quota

"reduction" was accompanied by a 16 percent loss of territory potential to Green Mountain

Office Systems and several national accounts, some with active proposals by Plaintiff and his

staff.  See id. at 3, 8 (citing Pl's Opp., Exh. 13, a June 1, 2000 memo from Plaintiff to John

Yerganian,[5] and Exh. 14, a list of accounts in the Hartford branch[6]).  Plaintiff claims that Clark

was able to disguise quota increases as decreases by not mentioning the accompanying loss of

territory or opportunity, which, according to Plaintiff, far exceeded the quota reductions.  See id.

at 3.  Defendants argue that although Plaintiff argues that the reduction was in fact an increase

due to reassignments, this is merely an "attempt to misconstrue the facts," as his territory "was in

the process of being downsized well before Mr. Clark became his supervisor in September

2000."  Defs' Reply at 7 n.4.  Indeed, Plaintiff's own evidence reveals that the reassignments

occurred while Yerganian was his supervisor, in or around June of 2000.  See Pl's Exhs. 13 and

14.

     Plaintiff also asserts that Clark began providing "Mid-Month Updates" in April of 2001

which unfavorably compared Plaintiff's performance mid-month to the target forecasted for the

entire month, giving the impression that Plaintiff's performance was less than fifty percent of

what it should have been.  Pl's Opp. at 13.  These were not followed up at the end of the month

---

[5]     In the June 1, 2000 memo, Plaintiff attempts to convince Yerganian not to reassign several accounts, explaining why he wants to retain certain territory "on the table for reassignment to Green Mountain," including U. Mass. (described as an "active major account") and Berkshire Life ("has 24 units and is growing . . . strong relationship with sales").

[6]     The list of accounts shows 101 accounts in the Hartford branch with handwritten notes next to two, Berkshire Life and U. Mass., saying "COMMERCIAL IF REASSIGNED BASED ON COPIER BASE AND RELATIONSHIP."  The other accounts discussed in the June 1, 2000 memo are not listed.  The list is not dated, but is signed by Plaintiff and Yerganian.

with a recap of actual results, which, Plaintiff claims, "were often more favorable."  Id. at 13.

Clark began to copy these updates to Human Resources, which Plaintiff maintains indicates that

he was contemplating disciplinary action, a charge that Clark denies.  Id. at 13-14.  The only

evidence that Plaintiff submits in support of these allegations is an April 16, 2001 memo from

Clark to Plaintiff, copying a "Georganna Coleman," saying that Plaintiff's second week forecast

is $113,000, but that as of April 13, 2001, the Hartford branch had only $51,000 in sold revenue.

See Pl's Exh. 16.

On July 10, 2001, Clark provided Plaintiff with a "6 Month Update," congratulating

Plaintiff on his second quarter performance and noting that the Hartford Branch was at 124

percent of quota for the quarter.[7]  See 7/10/01 memo, Peikes Aff. at Exh. B.  The memo went on

to say, however, that there are still "some key areas that need to be addressed," noting that

despite having two full-time managers in place—referring to Plaintiff, as Branch Manager and

Correll, as an ASM—and having the sold revenue target reduced to $110,000, the Hartford

Branch was only at 88 percent of sold revenue through June of 2001.  Id.  In the memo, Clark

states that it is necessary to have the Hartford Branch's performance levels over 100 percent of

sold revenue by mid-August or September, and if that does not happen, warns that the sold

revenue target will be set at its original level of $140,000 per month and the ASM quota at

$116,000 per month.  Id.

Defendants assert that Clark's "6 Month Update" failed to achieve the desired result and

accordingly, Clark issued a memorandum on August 6, 2001 entitled "Poor Performance."  See

8/6/01 memo, Peikes Aff. at Exh. B.  In the August memorandum, Clark states that "[d]espite

---

[7]        This percentage was based on the reduced sold revenue quota set by Clark at $110,000 per month.

several meetings," Plaintiff's "year to date and July's monthly performance remain below Office
Systems standards," noting that Plaintiff only managed to attain thirty-eight percent of quota in
July and that his "current year to date sales performance [was] 80% of sold quota."  Id.  Clark
refers to an attached weekly sales plan to assist Plaintiff in meeting company goals, warning that
"[f]ailure . . . to adhere to this program or meet the monthly minimum standards of $110,000 in
sold quota attainment will result in further disciplinary action, up to and including termination."
Id.  Defendants also allege that despite the numerous warnings, Plaintiff's results for August
were even worse than those for July, with the Hartford Branch remaining the lowest-producing
branch in the Northeast Region.  Defs' Mem. at 6 (citing Clark Aff. ¶ 11).

Plaintiff asserts, however, that Clark began, in July 2001, to put "unusually intense verbal
and written performance pressure" on him, this following a ten-month period in which Plaintiff
attained what he claims to be "the equivalent of 104% of the then-established revenue target."
Pl's Opp. at 16.  Defendants assert, however, that Clark did not begin to put "performance
pressure" on Plaintiff until July 2001, when "the Hartford Branch generated $41,489.00 in
revenue, putting it at 38% quota and dropping year-to-date performance below 75%."  See Defs'
Reply at 7 (quoting Defs' Rule 56(a) Statement at ¶ 14).  In an August 9, 2001 memo from
Plaintiff to Clark, Plaintiff disputes Clark's assessment of "poor performance" in his August 6,
2001 memo, arguing that since September of 2000, Plaintiff's revenue performance has been an
average of $114,207 per month, or 104 percent of his current quota.  Moreover, Plaintiff asserts
that his second quarter results for 2001 were 124 percent of quota with a "strong positive trend
through June."  Plaintiff contends that he "beat first quarter results by 108% and second quarter
revenue results for 2000 by 97%" and "qualified for a $2,000 bonus for this growth by blowing

10

away the national stretch growth of 20%."  Plaintiff notes that rather than "positive recognition" for performance "that ranked [him] nationally in the top 20% of branch performers [year to date] through June," he "received a series of memos beginning on July 10th threatening to raise my quota, and on July 17th elevating your concerns to Human Resources, and finally on July 24th threatening disciplinary action."  Plaintiff asks whether Clark can "honestly expect a clearheaded July performance . . . with this kind of feedback?"  Plaintiff adds that he is "open to [Clark's] suggestions" relative to his "need to keep management costs in line," but does not want his July results to disqualify him for any potential severance packages "should management downsizing occur as a result of the upcoming change in management."  Plaintiff ends his letter by saying that Clark has his "commitment to make up for July's shortfall within the third quarter of [2001]."  Pl's Exh. 19.

Plaintiff emphasizes, both in his memo to Clark and in his Opposition brief, that he was in the top 20 percent of all branches nationwide in June 2001, despite having lost 16 percent of his territory to Green Mountain Office Systems—which he allegedly lost in or around June of 2000, during Yerganian's tenure—as well as numerous national accounts.  Id. at 17.  Plaintiff attaches a chart listing revenues for July 2001 for all company offices.  See Pl's Exh. 10.  The chart shows the Hartford branch attaining 115.4 percent of sold quota and 68.4 percent of margin quota, with 91.9 percent combined attainment, ranking it as number 16 out of 58 branches nationwide or in the top 27.6 percent.  See Pl's Exh. 10.[8]  Plaintiff also asserts that Clark was putting more intense pressure on him while the younger, allegedly lower-performing Boston

---

[8]  Again, these percentages are based on the quotas set for each branch.  Plaintiff was operating under reduced quotas, specifically sold revenue quota for July 2001 was $110,000, with actual sales of $126,904, and margin quota was $55,000, with actual sales of $37,645.

Branch Manager, Darren Aizenman, remained "untouched."  Id; see also Pl's Exh. 10.  Plaintiff

fails, however, to produce any evidence in support of this assertion.   Moreover, Plaintiff claims

that he sought to provide written notice to Correll regarding "his large role in the [Hartford]

branch's downturn in performance," but was discouraged by Clark from doing so.  Id.

        Plaintiff discusses other pressure coming from Clark during this time, which allegedly

included more intrusive, frequent and lengthy communication via phone, interruptions in the

field, interruptions at home after-hours, interruptions while conducting business with clients and

the moving of Plaintiff's office, discussed below.  Id. at 17.  Plaintiff claims that Defendants

"made frequent, disruptive and often retaliatory reorganizations of the plaintiff's branch

operations, including, but not limited to, the plaintiff's demotion in September of 2001."  Id. at 3,

9.  For example, Plaintiff alleges that two months prior to being demoted (about August 2001),

Mr. Clark moved Plaintiff's office to a "remote area of the building," leaving Brian Correll, the

younger ASM, to directly supervise the sales force.  Id. at 9.  Plaintiff contends that as a result of

this change, sales plummeted.  Id. at 9.

        According to Defendants, Plaintiff agreed to step down as Branch Manager and assume

an ASM role, a demotion that was coupled with a corresponding decrease in salary, from $60,000

to $50,000 (a figure $5,000 above the maximum ASM salary of $45,000).  See Defs' Mem. at 6-

7.  Defendants attach a letter from Plaintiff to Clark, dated September 13, 2001, in which

Plaintiff formally "accepts" Clark's offer for an ASM position in the Hartford office.  In the

letter, Plaintiff acknowledges that his new ASM salary will be $50,000, effective October 1,

2001 and Plaintiff also notes his understanding that if he is able to achieve the stated "revenue

objectives"—as ASM, Clark imposed a step quota of $60,000 in September and October and

12

$70,000 in November and December—he will be reconsidered for the Branch Manager position in Hartford or in a larger branch. 9/13/01 Letter, Peikes Aff. at Exh. B.

Although Defendants assert that Plaintiff's move to an ASM position was done at his suggestion, see Clark Affidavit ¶ 12, Plaintiff contends that he wrote the letter under threat of termination and only after Clark "badgered" him to write a letter requesting an ASM position. Pl's Opp. at 18. He contends that Clark dictated the letter to him and that he, on several occasions, objected and asked Clark to write the letter himself. Id. Plaintiff says, however, that Clark told him that he would "manage [him] out of the Branch" if he did not write the letter and accordingly, after "several harassing calls," Plaintiff wrote the letter requesting the ASM position. Id. Plaintiff claims that he refused to edit out age-related language, i.e., that he "recognize[s] that [his] seniority has led to salary increases over the last 19 years that are inconsistent with my Office Systems pay structure for Branches of Hartford's size, and understand[s] that an extension of [his] current salary only through the end of this month is a condition of the offer." See id.; Pl's Opp. at Exh. 20. Plaintiff provides no citation to the record in support of his claim that he wrote and signed the letter under threat of termination.

Defendants assert that the "step" or "ramp" quota referred to in Plaintiff's letter was only used to determine bonus eligibility; Plaintiff was still expected to achieve the minimum ASM quota of $90,000. See Defs' Mem. at 7. Defendants also outline Plaintiff's performance for the rest of 2001, asserting that in September, Plaintiff's team generated $70,635, or 84 percent of the minimum ASM quota, in October, $26,168, or 34 percent of quota, in November, $61,862, or 74 percent of quota and in December, $32,709, or 29 percent of quota. Id. (citing Clark Aff. ¶ 13; Pl's Depo., Exh. 24, 26, 28). Thus, aside from September 2001, Plaintiff failed to meet either the

step quotas or the minimum ASM quota.

Plaintiff again presents a different version of events, asserting that after his "demotion" to ASM, Clark removed Correll, also an ASM, and his accompanying territory from Plaintiff's sales team, an action that Plaintiff alleges occurred immediately after he filed a formal written complaint regarding Clark's allegedly "ageist behavior."  Pl's Opp. at 9.  Additionally, Plaintiff claims that as ASM, his target was reduced only $26,667, to $83,333 (from $110,000 as Branch Manager).  Plaintiff asserts that he only received this small decrease even though he had access to only half the geography to attain quota since the Hartford branch was now divided between Plaintiff and Correll, which Plaintiff claims translated to a roughly 50 percent increase in his target.  Id. at 18-19.  Plaintiff states that he believes that Correll's target was reduced to $55,000, but has been unable to secure that information from Defendants.  See id. at 19; see also Pl's Exh. 2 (Motion to Compel).[9]  Plaintiff also states that he informally remained responsible for all branch administrative and service liason functions as the "Head of Branch," an "ad hoc" responsibility that Plaintiff claims Clark assigned him to "further burden" him. Pl's Opp. at 19.  Clark, however, asserts that during this time, *he* served as the acting Branch Manager.  See Clark Aff. ¶ 17.  Plaintiff also vaguely alleges that Clark made it difficult to get certain items and fill certain orders.  See Pl's Opp. at 19.

According to Defendants, Clark met with Plaintiff in December 2001 in order to discuss his options with him.  Clark offered Plaintiff a Major Account Executive ("MAE") position, in which Plaintiff would no longer be responsible for supervising lower-level employees.

---

[9]   As discussed previously, Plaintiff has not taken action to obtain this information.  He should not benefit from and Defendants should not be prejudiced by his inaction.  Accordingly, Plaintiff's assumption will not be credited.

Defendants assert that although Plaintiff was not interested in the MAE position, he did "renew[]
an earlier inquiry . . . about the possibility of leaving Imagistics with a severance package."
Clark informed Plaintiff that he thought that a severance package in the range of four to six
months salary was possible, although he stated that he would permit Plaintiff to continue as an
ASM if he could meet the minimum ASM sales quota.  Plaintiff agreed to try one more time.
Defs' Mem. at 8.  Clark subsequently sent Plaintiff a memorandum, entitled "Performance
Concerns," which confirmed this agreement and outlined that Clark would be putting Correll into
a MAE position and moving his three sales representatives and five territories to Plaintiff's team,
apparently putting him "two over manpower" and giving him almost the entire branch to work
with in order to attain his assigned targets, set at $90,000 for January through March, equivalent
to the minimum ASM quota.  See 1/3/02 memo, Peikes Aff. at Exh. B.

Plaintiff relays a different version of events.  On December 14, 2001, Plaintiff filed age
discrimination claims against Defendants with the Connecticut Commission on Human Rights
and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC").[10]
Plaintiff alleges that Clark called him on December 30, 2001 and "threatened to demote him once
again to a [MAE]."  Pl's Opp. at 19.  Plaintiff says that although Clark "couched his demotion as
an 'offer,'" he threatened to "manage him out" if Plaintiff refused the MAE position.  Id.
Plaintiff refused to accept the MAE position and says that in the course of the conversation,
Clark also "expressed disappointment over the CHRO complaint."  Id.  Moreover, Plaintiff

---

[10]     Plaintiff filed his third and final complaint with the CHRO following his termination, claiming that
he was fired for discriminatory and/or retaliatory reasons.  The current action was pending at the
time that Plaintiff filed his third CHRO charge.  On April 14, 2004, the CHRO dismissed his third
charge after a merit assessment review, finding "no reasonable probability that investigating the
complaint would result in a finding of reasonable cause" and on May 5, 2004, issued a Release of
Jurisdiction.

alleges that Clark called Plaintiff several times during the day demanding a decision on the offer, which Plaintiff continued to refuse.  Id.  Finally, as an alternative to the demotion, Clark offered Plaintiff a severance package, such that Defendants would pay Plaintiff six months salary if he resigned.  Id. at 19-20.  At Plaintiff's request, however, any decision on the offers was postponed until the New Year.  Id. at 20.

On January 9, 2002, Plaintiff sent Clark a memo entitled "Performance Concerns: Your letter of January 3rd."  See Pl's Exh. 19.  In the letter, Plaintiff notes the targets that he and Clark had agreed on in September of 2001 when he became an ASM[11] and says that Clark has "always recognized written performance by contract dates regardless of whether or not it hits order status reports by month end."[12]  Based on written performance, Plaintiff alleges that he was nearly seventy percent, rather than forty-four percent, of target for December.  Plaintiff further alleges that he attained 120 percent of target in September and 114 percent in November, which Clark failed to document in any letters.  Moreover, Plaintiff maintains that his team "wrote $266,287 in revenue" over the four-month period.[13]

After discussing his performance for September through December of 2001, Plaintiff notes that Clark called him on December 28 to alert Plaintiff that he was aware of his CHRO

---

[11]    According to the evidence submitted, these targets were $60,000 for September and October and $70,000 for November and December, adding up to a total of $260,000 for the four-month period. See 9/13/01 Letter, Peikes Aff. at Exh. B; Defs' Mem. at 7.

[12]    Plaintiff attaches, in Exhibit 24, an April 30, 2002 memo from Chris Dewart to all Commercial Region Vice Presidents.  The Dewart memo reminds the Vice Presidents that although the company pays on installed margin, "[t]he real impact of a sales leader is the generation of new sales," and therefore, "any measurement of actual performance statistics for evaluation, review and corrective action planning, should be tied to the measurement of monthly and [year to date] written sales revenue."

[13]    Plaintiff notes that $48,048 of this total is still pending credit, however, he asserts that $218,239 "has been or can be installed immediately."  Jan. 9, 2002 memo, Pl's Exh. 19.

16

complaint and offer him some options, which, according to Plaintiff, included: (1) demotion to MAE; (2) retention in the ASM position "under a program;" and (3) a four to six month severance package.  Plaintiff alleges, in the memo, that he asked for time to think about his options, at which point Clark "became angry and took all of the options off table," deciding that Plaintiff would remain an ASM but be placed on a "progressive corrective action" program. 1/9/02 memo, Pl's Exh. 19.

According to Plaintiff, Clark called him several more times to press him for a decision and to put the options back on the table.  At one point, Plaintiff asserts that he chose the six-month severance package and told Clark that he believed that he was targeting him for termination based on his age, but that Clark reassured him and persuaded him to remain at the company as an ASM, saying that doing so would not affect his future ability to obtain a severance package.  See id. at Pl's Exh. 19.

Plaintiff alleges that following that conversation, on January 7, 2002, Clark faxed him a letter discussing Clark's "interpretation" of Plaintiff's performance and outlining a performance plan that Plaintiff characterized as "more stringent than any other plans, written or discussed" that were presented to him in the past.  According to Plaintiff, Clark "mentioned termination as a consequence for not meeting the plan."  In the January 9 memo, Plaintiff acknowledges Clark's letter, but notes that he does not agree with everything it contains and therefore would consult with counsel prior to signing the document.  See id. at Pl's Exh. 19.

Plaintiff claims that he and Clark agreed that Plaintiff could stay on as an ASM with Correll on his team as a MAE without any additional quota increases.  Pl's Opp. at 20; see also Pl's Exh. 23 (January 10, 2002 email from Clark, sent at 1:28 p.m., confirming the above

17

arrangement).  According to Plaintiff, at or about the same time that Clark sent an email confirming this agreement, Plaintiff, without knowledge of the email, faxed a letter to Clark outlining his age-related grievances.  Id.; see also Pl's Exh. 23 (showing a fax time of 2:50 p.m.). Plaintiff claims that Clark rescinded the offer later that day, representing that it was the decision of his supervisor.  Id.; see also Exh. 23 (showing a subsequent January 10, 2002 email from Clark sent at 3:17 p.m.).  In the subsequent email, Clark represents that his supervisor, Chris Dewart, Vice President of Sales, would not approve the above arrangement, but offers to allow Correll to stay on Plaintiff's team with a quota increase of $10,000 per month.  See Exh. 23.

Plaintiff alleges that he spoke with Clark later about the above offer, as Plaintiff was concerned that he was assisting and supporting Correll without any discernable benefit to himself.  Pl's Opp. at 20.  Plaintiff says, however, that Clark refused to honor the original agreement and instead set new targets for Plaintiff's other salespeople as a condition of reinstating that agreement.  Id. at 21.  Moreover, Plaintiff contends that when he began to attain Clark's targets, Clark altered the way they were determined.  Id. (citing Exh. 24[14]).

In February 2003, Clark agreed to reinstate Correll and his accompanying territory, however, Plaintiff contends that when Clark learned that Plaintiff intended to pursue his age discrimination complaint (i.e., when he discovered that a hearing date had been set), Clark began

_____

[14]    Plaintiff attaches, in Exhibit 24, an April 30, 2002 memo from Chris Dewart to all Commercial Region Vice Presidents and a May 2, 2002 memo from Plaintiff to Clark.  The Dewart memo reminds the Vice Presidents that although the company pays on installed margin, "[t]he real impact of a sales leader is the generation of new sales," and therefore, "any measurement of actual performance statistics for evaluation, review and corrective action planning, should be tied to the measurement of monthly and [year to date] written sales revenue."  Plaintiff's May 2 memo provides Clark with the year to date revenues (through April 2002) and asks for Clark to implement the arrangement discussed in the first January 10, 2002 email, asking Clark to speak to Dewart and see whether he will "authorize the change (retroactive if possible :-)."

to disturb Plaintiff while he was on sales calls,[15] and subsequently removed Correll from

Plaintiff's assigned territory and removed three additional territories along with their associated

revenue opportunities, assigning them to John Partenio, an Imagistics employee in his 30s.  Pl's

Opp. at 9-10, 21.  Plaintiff claims that the above actions "contributed to a reduced opportunity . .

. to meet his performance goals."  Id. at 21.  Upon Plaintiff's termination in July 2003, Plaintiff

says that "despite poor performance in previous management capacities, [Correll] became the

acting Branch Manager."  Id. at 4, 10.  As for Plaintiff's termination, Defendants simply allege

that despite the various changes and accommodations made on Plaintiff's behalf, he was never

able to sustain acceptable productivity levels and on July 1, 2003, his employment was

terminated.  Defs' Mem. at 9.

In his Opposition, Plaintiff maintains that Clark has an "ageist reputation," based

primarily on his alleged tendency to promote the merits of ASMs—a generally younger class of

managers—over the necessity of their direct supervisors, the Branch Managers—typically an

older, more tenured class of managers.  See Pl's Opp. at 10-11.  Plaintiff alleges that from the

beginning of Clark's tenure, he exhibited "ageist tendencies and discriminatory behavior,"

including making ageist comments about Plaintiff and one of Plaintiff's older employees,

Leverett Barr, who was approximately fifty years old at the time.  Id. at 2.  Plaintiff maintains

---

[15]    The only evidence Plaintiff provides in support of this assertion is a type-written, unsigned,
undated statement, ostensibly written by Plaintiff.  See Pl's Exh. 25.  The statement alleges that
Clark informed Plaintiff, on February 5, 2003, that he was putting John Partenio, a former
employee who "Clark never exhibited any respect for," in the Hartford branch as a Copier Team
Leader ("CTL").  Plaintiff asserts that this would remove three territories from his control and
would decrease his opportunity to make bonus and keep Correll on his team (Plaintiff maintains
that three territories represented 50 percent of his territory structure at the time, however, the
lowest ASM quota was only 32 percent lower than the quota he had at the time).  Plaintiff believed
that Clark was and accused Clark of doing this in retaliation for Plaintiff pursuing the CHRO
complaint, a charge which Clark denied at the time, saying that it was a "business decision" and
that he was looking out for Plaintiff.  See id.

that upon attaining his position as Regional Vice President, Clark began an "immediate campaign" to terminate Barr and made various "ageist" comments about him, saying that Barr was "too old to recover from his poor performance," had a "low energy level," was "set in his ways," "did not have an incentive to work as hard" on account of his age, and needed to be replaced with a "college kid." Id. Plaintiff also alleges that Clark pressured he and Correll to "manage" Barr out of his position. Id. at 12. Barr eventually resigned and was replaced by Craig Strassel, a twenty-five year old employee, who, according to Plaintiff, had performance levels only slightly better than Barr's and not high enough to qualify for a promotion. See id. at 13.

Plaintiff contends that after these events took place, Correll expressed concern to Plaintiff regarding Clark's "ageist tendencies," at which point Plaintiff confided in Correll about his own job concerns. Plaintiff alleges that "an acceleration of negative performance feedback from Clark" followed this discussion, leading Plaintiff to believe that Clark was retaliating against him for having this conversation. Id.

Plaintiff also discusses various "rumors" about Clark's behavior that circulated through the company, alleging that other senior managers at the Branch and Regional Vice President levels suffered due to Clark's "scathing ASM reviews." Plaintiff cites a "particularly punishing review" of then Boston Branch Manager Ed Dequinzio, who was approximately fifty years old at the time, stating that Dequinzio was terminated during Clark's tenure as the National Sales Development Manager, a position he held through 1999 and the first half of 2000. Plaintiff also claims that Sandy Navin, Plaintiff's Regional Vice President prior to Yerganian, received bad reviews and as a result, was demoted to a director position with no direct reports in 2000, again while Clark was acting as the National Sales Development Manager. According to Plaintiff,

20

Navin eventually took the equivalent of a Branch Manager position with Defendants.  See Pl's

Opp. at 10-11.

     Plaintiff also alleges that Clark made at least one comment referring to Plaintiff's age.

According to Plaintiff, Clark commented, in reference to an order Plaintiff won in early 2001,

that "the old guy still has it in him."  Pl's Opp. at 14.  Plaintiff also claims that, according to

Brian Correll and Craig Strassel, Clark made this comment again in reference to a successful

performance by Plaintiff during a teleconference of Northern Region managers.  Id.  Plaintiff

alleges, more generally, that Clark has made other comments in reference to Plaintiff's or other

managers' ages, including "veteran" and "seasoned manager."  Id.

     Plaintiff alleges, as evidence of Defendants' "ageism," that Human Resources generally

processed the applications of older candidates slower than those of younger applicants.  Plaintiff

asserts that processing applications for sales positions generally takes three to five business days,

however, Plaintiff claims that he had to wait over thirty days for Human Resources to process the

applications of two "highly qualified candidates," Jack Grezel and Dave Carey, both over forty

years old.  Plaintiff alleges that when he asked Clark about this, Clark told him that Defendants

wanted to hire salespeople in the twenty-five to thirty-five age range or recent college graduates.

Plaintiff says that he "strenuously objected" to this practice and that both Human Resources and

Clark relented, however, according to Plaintiff, by that time Grezel and Cary had "lost interest"

in the positions.  In support of these assertions, Plaintiff cites Exhibit 18, where he attaches two

applications for employment and two resumes, one for David Carey and the other for Jack

Grezel.  Handwritten notes on Carey's application indicate that it was "sent up for approval" on

July 31, 2000 and that Carey was interviewed by Clark on August 31, 2000, indicating only that

it did take thirty days from the time that the application was sent up for approval to the time that

Carey was interviewed.  There are no similar indications on Grezel's application.  <u>See</u> Pl's Exh.

18.

### III.  STANDARD OF REVIEW

Summary judgment is appropriate only when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  No genuine issue of material fact exists and summary

judgment is therefore appropriate when "the record taken as a whole could not lead a rational

trier of fact to find for the non-moving party."  <u>Matsushita Elec. Indus. Co. v. Zenith Radio</u>

<u>Corp.</u>, 475 U.S. 574, 587 69, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)).  A material fact is one

which "might affect the outcome of the suit under the governing law" and an issue is genuine

when "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202

(1986)).  Importantly, however, "[c]onclusory allegations will not suffice to create a genuine

issue."  <u>Delaware & H. R. Co. v. Conrail</u>, 902 F.2d 174, 178 (2d Cir. 1990).

The moving party bears the burden of establishing that summary judgment is appropriate,

<u>Anderson</u>, 477 U.S. at 255, and the court should "draw all factual inferences in favor of the party

against whom summary judgment is sought, viewing the factual assertions in materials such as

affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion."

<u>Rodriguez v. City of N.Y.</u>, 72 F.3d 1051, 1060 (2d Cir. 1995) (citations omitted).

Determinations of the weight to accord evidence or assessments of the credibility of witnesses

are improper on a motion for summary judgment as such are within the sole province of the jury.

Hayes v. N.Y. City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996).  "If reasonable minds could

differ as to the import of the evidence . . . and if . . . there is any evidence in the record from any

source from which a reasonable inference in the nonmoving party's favor may be drawn, the

moving party simply cannot obtain a summary judgment."  R.B. Ventures, Ltd. v. Shane, 112

F.3d 54, 59 (2d Cir. 1997) (internal citations omitted); see also Sologub v. City of New York,

202 F.3d 175, 178 (2d Cir. 2000) ("When reasonable persons applying the proper legal standards

could differ in their responses to the questions raised on the basis of the evidence presented, the

question is best left to the jury.").

"At summary judgment in an employment discrimination case, a court should examine

the record as a whole, just as a jury would, to determine whether a jury could reasonably find an

invidious discriminatory purpose on the part of an employer."  Byrnie v. Town of Cromwell,

Board of Education, 243 F.3d 93, 102 (2d Cir. 2001).  Although caution must be exercised before

granting summary judgment to an employer in an ADEA case where discriminatory intent and

state of mind are in dispute, see Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir.

2000),

> it is now beyond cavil that summary judgment may be appropriate even in the
> fact-intensive context of discrimination cases. . . . The salutary purposes of summary
> judgment—avoiding protracted, expensive and harassing trials—apply no less to
> discrimination cases than to . . . other areas of litigation.

Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001) (citing Meiri v. Dacon,

759 F.2d 989, 998 (2d Cir. 1985)); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S.

133, 148 (2000) ("Trial courts should not treat discrimination differently from other ultimate

questions of fact").

## IV. DISCUSSION[16]

Plaintiff alleges that Defendants discriminated against him on the basis of age in violation of both the ADEA and the CFEPA when he was demoted, terminated and replaced by a younger and less experienced employee.  Defendants argue Plaintiff's "demotion" was agreed to by him "in the face of his well-documented lack of production and non-performance as a Branch Manager" and that Plaintiff's claims of "retaliatory" acts pertain to employment actions with "little or no tangible consequence," and therefore are not sufficiently "adverse" to qualify as a viable cause of action.  In the alternative, Defendants argue that Plaintiff's claims rely entirely on "mere speculation or conjecture" about Defendants' motivations and thus should be dismissed on summary judgment.

### A.  Discrimination

#### 1.  ADEA and the Burden Shifting Analysis

The ADEA makes it "unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  The ADEA covers the class of employees who, like Plaintiff, are over the age of 40.  See 29 U.S.C. § 631(a).  ADEA claims are analyzed under Title VII's burdenshifting framework

---

[16]    Plaintiff's Complaint alleges violations of both the ADEA and CFEPA.  Claims of age discrimination under both laws are subject to the same legal analysis and therefore, the discussion below applies to the federal and state law causes of action, as Defendants have moved for summary judgment on both counts.  See Bd. of Educ. v. Comm'n on Human Rights and Opportunities, 266 Conn. 492, 504 n.18, 832 A.2d 660, 668 n.18 (2003); Hayes v. Compass Group USA, Inc., 343 F. Supp. 2d 112, 118 n.2 (D. Conn. 2004) (considering the plaintiff's CFEPA claim together with his ADEA claim on the basis of federal precedent) .

as set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817

(1973).  See Hazen Paper Co. v. Biggins, 507 U.S. 604, 612, 123 L. Ed. 2d 338, 113 S. Ct. 1701

(1993) (noting that the McDonnell Douglas proof standard applies to ADEA claims).

In order to establish a viable ADEA claim, a plaintiff must first make a prima facie case

of age discrimination.  See Auerbach v. Bd. of Educ., 136 F.3d 104, 109 (2d Cir. 1998).  If the

plaintiff is able to make out a prima facie case of age discrimination, the burden then shifts to the

defendant to establish a legitimate, nondiscriminatory business reason for its action. See Texas

Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981); Auerbach, 136 F.3d at 112; see 29

U.S.C. § 623(f)(2).  Although the McDonnell Douglas framework places the burden on the

defendant of producing an explanation to rebut the plaintiff's prima facie case, it is important to

remember that the ultimate burden of persuading the trier of fact that the defendant intentionally

discriminated on the basis of age remains at all times with the plaintiff.[17]  Burdine, 450 U.S. at

253; Reeves, 530 U.S. at 143.  If the employer succeeds in articulating such a reason, the

presumption of discrimination arising from the establishment of the prima facie case "drops from

the picture" and the burden shifts back to the plaintiff to show both that the employer's proffered

reason is mere pretext for discrimination *and* that the plaintiff's age was the actual motivating

factor.  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993); Weinstock v.

Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000); Schnabel v. Abramson, 232 F.3d 83, 88 (2d Cir.

2000) (plaintiff must "present sufficient evidence for a reasonable jury to conclude that

---

[17] The presumption operates, in this regard, like all other presumptions as described in Federal Rule of Evidence 301: "In all civil actions and proceedings . . . a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast."

defendants discriminated against him because of his age") (internal alternations and citations omitted).  The plaintiff need not show that "age was the only or even the principal reason for the complained-of employment action," only that "age played a motivating role in, or contributed to, the employer's decision."  Renz v. Grey Advertising, Inc., 135 F.3d 217, 222 (2d Cir. 1997).

## 2.  Plaintiff's Prima Facie Case

To make out a prima facie case of age discrimination, age discrimination plaintiffs must show: (1) that the employee is a member of the protected class (i.e., is 40 years of age or older), (2) that the employee is qualified for the position, (3) that the employee suffered an adverse employment action and (4) that the circumstances surrounding the action give rise to an inference of age discrimination.  McDonnell Douglas, 411 U.S. at 802; accord Abrahamson v. Bd. of Educ., 374 F.3d 66, 71 (2d Cir. 2004).  Plaintiff's burden at this stage is not an onerous one; he merely has to present facts sufficient to give rise to a presumption[18] of age discrimination.  See Burdine, 450 U.S. at 254; Weinstock, 224 F.3d at 42 (holding the plaintiff to a "de minimis burden of proof at the prima facie stage").

In the instant case, Plaintiff, being over the age of forty at all relevant times, is a member of a protected class, is "qualified" for the position,[19] has suffered a termination (i.e., an adverse

---

[18]   "To establish a 'presumption' is to say that the finding of the predicate fact (here, the prima facie case) produces a 'required conclusion in the absence of explanation' (here, the finding of unlawful discrimination)."  Hicks, 509 U.S. at 506-07 (quoting 1 D. Louisell & C. Mueller, Federal Evidence § 67, p. 536 (1977)).

[19]   Although Defendants do not contest this issue, it is clear that Plaintiff was "qualified" for the position, at least for purposes of proving his prima facie case.  In Slattery v. Swiss Reins. America Corp., 248 F.3d 87, 92 (2d Cir. 2001), the Second Circuit said that the burden was a minimal one, requiring plaintiff to show only that he "possesses the basic skills necessary for performance of the job." (internal alternations and citation omitted).  The Court went on to note that "especially where discharge is at issue and the employer has already hired the employee, the inference of minimal qualification is not difficult to draw."  Id. (citation omitted).

employment action) and, viewing the facts in the light most favorable to Plaintiff, the
circumstances surrounding his termination give rise to an inference of age discrimination.  See
McDonnell Douglas, 411 U.S. at 802 (articulating the elements of the prima facie case); see also
Weinstock, 224 F.3d at 42 (explaining that Plaintiff's burden at this stage is "de minimus").
Defendant does not argue that Plaintiff has failed to prove a prima facie case and therefore it is
assumed, without actually being decided, that Plaintiff has done so.  See Def's Mem. at 13
(arguing that "[b]ecause Plaintiff is incapable of demonstrating the existence of a material factual
dispute on the ultimate issue" of whether Plaintiff's age motivated Defendants' decision to
demote and terminate him, "there is no need to address the individual prima facie proof
requirements associated with his claim for discriminatory demotion").

    3.  Legitimate, Nondiscriminatory Reasons for Discharge

        Assuming that Plaintiff has made out a prima facie case of age discrimination, the burden
then shifts to the employer to establish a legitimate, nondiscriminatory business reason for its
action. See Burdine, 450 U.S. at 254; Auerbach, 136 F.3d at 112; see 29 U.S.C. § 623(f)(2).
Defendant's burden is "one of production, not persuasion[, and] . . . involv[es] no credibility
assessment."  Reeves, 530 U.S. at 142; see also Hicks, 509 U.S. at 510-11 (1993) (explaining
that "the burden of production determination necessarily precedes the credibility-assessment
state").  Defendant "need not persuade the court that it was actually motivated by the proffered
reasons . . . . [as i]t is sufficient if the defendant's evidence raise a genuine issue of fact as to
whether it discriminated against the plaintiff."  Burdine, 450 U.S. at 254.  To carry its burden and
raise a genuine issue of fact, Defendant must, using admissible evidence, set forth reasons which
are sufficient to support a finding that unlawful discrimination was not the cause of the

employment action.  Id. at 254-255 and n. 8.

Defendant has articulated a legitimate non-discriminatory reason for demoting Plaintiff and for subsequently terminating his employment, namely, that Plaintiff was unable to meet his sales quotas and maintain an adequate level of productivity.  See Defs' Mem. at 13.  Plaintiff's inadequate performance and inability to meet his sales quotas are well-documented in Yerganian's and Clark's evaluation memos and in some of Plaintiff's replies.  Defendants also assert that Plaintiff's demotion was agreed to in the face of his well-documented lack of production and non-performance as a Branch Manager.  See Defs' Mem. at 6-7; see also Slattery v. Swiss Reins. America Corp., 248 F.3d 87, 93 (2d Cir. 2001) (finding that because the defendant's dissatisfaction with the plaintiff's performance was "well-documented," the defendant "easily met its burden of demonstrating a legitimate, non-discriminatory reason for its actions").  "Because [Defendants'] stated reasons for the challenged action are strongly supported by the evidence, the burden on plaintiff to prove that they are a pretext for discrimination [is] substantial."  Lucibello v. Yale-New Haven Hosp., 2005 U.S. Dist. LEXIS 3604, at *22, 2005 WL 578324, at *7 (D. Conn. Mar. 10, 2005); see also Lieberman v. Gant, 630 F.2d 60, 65 (2d Cir. 1980) (holding that to allow a jury to discredit the defendant's proffered reasons for its actions, the plaintiff must show that defendant's reasons are "so ridden with error that [the defendant] could not honestly have relied upon [them]"); Fuentes v. Perskie, 32 F.3d 759, 765 (3rd Cir. 1994) (to discredit the employer's proffered reasons, plaintiff must demonstrate "weaknesses, implausibilities, inconsistencies, or contradictions in [them]").

4.  Evidence that Defendants' Proffered Reasons are Pretext for Discrimination and that Plaintiff's Age was the True Reason for Discharge

The employer having articulated a facially legitimate, nondiscriminatory reason for Plaintiff's discharge, the ultimate question in this action is whether Plaintiff has presented sufficient evidence from which a reasonable finder of fact could conclude that the articulated reasons were pretextual and that the real reason for Plaintiff's demotion and termination was his age.  Roge v. NYP Holdings, Inc., 257 F.3d 164, 169 (2d Cir. 2001); see also Hicks, 509 U.S. at 511 ("The defendant's production (whatever its persuasive effect) having been made, the trier of fact proceeds to decide the ultimate question: whether plaintiff has proved that the defendant intentionally discriminated against him because of his [age].") (citations omitted).  To meet this burden, Plaintiff must "produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate,  non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action.'" Weinstock, 224 F.3d at 42 (internal quotations omitted).

Plaintiff can prove his case directly, "by persuading the court that a discriminatory reason more likely motivated the employer," or indirectly, "by showing that the employer's proffered explanation is unworthy of credence."  Burdine, 450 U.S. at 256 (citing McDonnell Douglas, 411 U.S. at 804-805).  Although "direct evidence of discrimination is not necessary," Carlton, 202 F.3d at 135, "an employer [is] entitled to judgment . . . if the record conclusively reveals some other, nondiscriminatory reason for the employer's decision, or if the plaintiff only creates a weak issue of fact as to whether the employer's reason was untrue and there [is] abundant and uncontroverted independent evidence that no discrimination had occurred."  Reeves, 530 U.S. at 148; see also Norton v. Sam's Club, 145 F.3d 114, 118-120 (2d Cir. 1998) (holding that an age discrimination case "may be built entirely out of circumstantial evidence"); Rosen v.

Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991) (recognizing that employers are unlikely to leave "smoking gun" evidence "attesting to discriminatory intent").

Plaintiff argues that a jury could infer that the reason given for the denial of tenure was pretext for discrimination based on Plaintiff's evidence that Clark was biased against Plaintiff because he was an older employee, that Clark had a history of age-based discrimination, that Defendants applied a more stringent standard to Plaintiff than it did to younger employees, that there were certain factual distortions and number manipulations involved in Clark's evaluations of Plaintiff and that Defendants generally refused, or at least were reticent, to hire older employees.  Defendants claim that even if Plaintiff's allegations on these points are accurate, there remains a complete absence of "evidence from which a reasonable factfinder could infer that a discriminatory motive played a role in [the alleged demotion]."  Def's Mem. at 14 (quoting Soderberg v. Gunther Int'l Ltd., 2004 U.S. Dist. LEXIS 292, at *, 2004 WL 57380, at *5 (D. Conn. Jan. 7, 2004), aff'd, 124 Fed. Appx. 30 (2d Cir. 2005)).

### a.  Plaintiff's Contradictions of Defendants' Proffered Reasons

Defendants present a significant amount of evidence, primarily in the form of disciplinary memos, going to show that Plaintiff's performance from July 2000 until his termination in July 2003 was, with some exceptions, sub-par.  Plaintiff disagrees with Defendants' assessments in almost every instance, arguing that his poor performance in 2000 was due to a "personnel matter" in the Hartford Branch, see Pl's Opp. at 6-7, that Clark's allegations of poor performance were due to the fact that his "quota decreases" were in fact disguised "quota increases," see id. at 3, 8-9, that Clark's "Mid-Month Updates" did not accurately portray his performance, see id. at 13-14, that he had trouble keeping his numbers up due to the loss of 16 percent of his territory

potential, see id. at 8, 17, that sales suffered when Clark moved his office to a "remote area of the building," see id. at 9, and that when he began, in 2002, to attain Clark's targets, Clark altered the way they were determined, see id. at 21.  Plaintiff has arguably raised some issues about whether Defendants treated him fairly, however, "[m]erely disagreeing with an employer's assessment, or even suggesting that an employer has not been fair in its stated reasons for terminating an employee does not satisfy a plaintiff's burden: [Plaintiff] must raise a genuine issue of material fact that the decision to terminate him was motivated at least in part by an *unlawful* reason, i.e., age discrimination."  Jensen v. Garlock, Inc., 4 F. Supp. 2d 219, 222 (W.D.N.Y. 1998) (emphasis in original); but see Reeves, 530 U.S. at 148 (holding that, in limited cases, "[a] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated").

Plaintiff presents evidence of successful performance in the beginning of his tenure as Hartford Branch Manager in 1998 and 1999, however, the fact that the Plaintiff demonstrated strong performance for over two years is not sufficient to prove that Defendants' negative performance evaluations and reasons for Plaintiff's demotion and termination are a pretext for age discrimination—especially since, in this case, the alleged adverse employment actions took place between 2001 and 2003.  In Jensen, 4 F. Supp. 2d at 223, the court held that the mere fact that the age discrimination plaintiff had received satisfactory performance evaluations for twenty-three years did not create a "genuine issue of material fact regarding an unlawful motivation for his termination," reasoning that "[w]hile a lengthy period of satisfactory performance may raise an inference of discrimination for purposes of establishing a prima facie case, by itself, such a factor is insufficient to suggest that an employer's amply supported reasons for terminating an

employee are pretextual."  The court went on to say that "for some employees, performance that is deemed adequate for a long period of time can become inadequate in a changed economic climate, or following a shift in job responsibilities, or in the eyes of a different supervisor. Without more, however, this is not unlawful."  Id.; see also McCarthy v. New York City Tech. Coll., 202 F.3d 161 (2d Cir. 2000) (finding in favor of the defendant despite the fact that during his eleven-year tenure with the College, the plaintiff had been rated as "excellent" or "very good" in all categories in his performance evaluations).

Although Plaintiff vehemently disputes Defendants' claim that he was fired on the basis of his poor work performance and failure to meet his performance goals, he cannot stop there. As discussed above, disbelieving Defendants' reasons is not sufficient to create a triable issue of fact on his discrimination claim.  Even if Defendant's reasons are rejected entirely, Plaintiff still must produce evidence from which a reasonable factfinder could infer that a discriminatory motive played a role in his termination and that Defendant's asserted reasons were merely a pretext for discrimination.  Fisher v. Vassar Coll., 114 F.3d 1332, 1339 (2d Cir. 1997).  Although the fact that "an employer gives a pretextual reason for its action may indeed give support to the inference of prohibited discrimination," "the mere fact of a pretextual explanation, without circumstances suggesting that the true motivation" was discriminatory, is insufficient to support Plaintiff's case.  McCarthy, 202 F.3d at 166 ("An employer's assertion of false reasons does not eliminate the requirement that the evidence, considered in its entirety, including any inference reasonably drawn from the falsity of the proffered reasons, must be capable of supporting a reasonable finding that the true reason was the prohibited discrimination plaintiff alleges."); see also Lizardo v. Denny's Inc., 270 F.3d 94, 104 (2d Cir. 2001) (to withstand summary judgment,

plaintiffs needed to do more than "cite to their mistreatment and ask the court to conclude that it

must have been related to [discrimination]").

### b. Alleged Age-Based Remarks

Courts have generally held that "stray remarks, even if made by a decisionmaker, do not

constitute sufficient evidence to make out a case of employment discrimination, unless there is

other evidence of discrimination in the record." Hayes v. Compass Group USA, Inc., 343 F.

Supp. 2d 112 (D. Conn. 2004) (citing Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir.

1998)); see also Ungergleider v. Fleet Mortgage Group of Fleet Bank, 329 F. Supp. 2d 343, 358

(D. Conn. 2004) (holding that occasional "stray remarks . . . are not sufficient to show that [the

defendants'] reasons are pretextual" and that such remarks "are rarely given weight, particularly

if they were made temporally remote from the date of decision"); Burrell v. Bentsen, 91 Civ.

2654, 1993 U.S. Dist. LEXIS 18005, at *29-30 (S.D.N.Y. Dec. 21, 1993) (stray remarks in

workplace, statements by non-decisionmakers, and statements by decisionmakers unrelated to

decisional process are not by themselves sufficient to satisfy plaintiff's burden of proving

pretext) (internal quotations and citation omitted).

Courts within the Second Circuit also frequently find uncorroborated statements

insufficient to defeat summary judgment unless the person making the remarks makes "repeated

statements clearly indicative of age-based preferences or discriminatory motive." See Punsal v.

Mt. Sinai Servs., 2004 U.S. Dist. LEXIS 5739, at *31, 2004 WL 736892, at *11 (S.D.N.Y. Apr.

6, 2004) (finding that the remarks at issue were "no more than mere flippancies and too

immaterial to withstand a properly supported motion for summary judgment"); but see Holtz v.

Rockefeller & Co., 258 F.3d 62, 77-78 (2d Cir. 2001) (the plaintiff's evidence of discriminatory

33

intent consisted of uncorroborated statements, however, the court denied defendant's motion for summary judgment because the supervisor: (1) went on at length that he was training the new employee because she was young and hence, "a good employee to invest in;" (2) on a separate occasion he stated that he enjoyed training young women; and (3) when plaintiff asked when her supervisor would train her, he responded that he preferred to train young women instead).  In Pasha v. William M. Mercer Consulting, Inc., for example, the court granted summary judgment despite a few "questionable" remarks by the employer, saying that for an employer's remarks or statements to be sufficient to carry Plaintiff's burden, they must "directly manifest[] a discriminatory attitude, of a sufficient quantum and gravity that would allow the factfinder to conclude that attitude more likely than not was a motivating factor in the employment decision." 2004 U.S. Dist. LEXIS 1226, at *17-18, 2004 WL 188077 (S.D.N.Y. Feb. 3, 2004) (quoting Erickson v. Farmland Indus., Inc., 271 F.3d 718, 724 (8th Cir. 2001)), aff'd, 135 Fed. Appx. 489 (2d Cir. 2005).

Generally, verbal comments constitute evidence of discriminatory motivation when a plaintiff can demonstrate that a "nexus" exists between the statements alleged to be discriminatory and the defendant's decision to demote and/or terminate the plaintiff.  Schreiber v. Worldco, LLC, 324 F. Supp. 2d 512, 518 (S.D.N.Y. 2004) (citations omitted).  To determine whether a comment is a probative statement evidencing an intent to discriminate or a non-probative "stray remark," courts consider the following factors: "(1) who made the remark, i.e., a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, i.e., whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was

34

made, i.e., whether it was related to the decisionmaking process." Id. at 518-19 (citing, among

others, Minton v. Lenox Hill Hosp., 160 F. Supp. 2d 687, 694 (S.D.N.Y. 2004); see also Rizzo v.

Amerada Hess Corp., 99 Civ. 0168, 2000 U.S. Dist. LEXIS 18754, at *17-18 (N.D.N.Y. Dec. 29,

2000) ("An employer's discriminatory statements will rise above the level of stray remarks . . .

when the statements are: (1) made by the decision maker or one whose recommendation is

sought by the decision maker; (2) related to the specific employment decision challenged; and (3)

made close in time to the decision.").

It is important to bear in mind, however, the Second Circuit's admonition that "although

evidence of one stray comment by itself is usually not sufficient proof to show age

discrimination, that stray comment may 'bear a more ominous significance' when considered

within the totality of the evidence." Carlton, 202 F.3d at 136 (quoting Danzer, 151 F.3d at 56).

"Even 'stray remarks in the workplace by persons who are not involved in the pertinent decision

making process ... may suffice to present a prima facie case,' provided those remarks evidence

invidious discrimination." Belgrave v. City of New York, 95 Civ. 1507, 1999 U.S. Dist. LEXIS

13622, at *89-90 (E.D.N.Y. Aug. 31, 1999) (quoting Ostrowski v. Atlantic Mut. Ins. Cos., 968

F.2d 171, 182 (2d Cir. 1992)); see also Malarkey v. Texaco, Inc., 983 F.2d 1204, 1210 (2d Cir.

1993) (holding that statements made by non-decisionmakers were properly regarded as probative

evidence "because they showed the pervasive corporate hostility towards [plaintiff] and

supported her claim that she did not receive a promotion due to her employer's retaliatory

animus"); Warren v. Halstead Indus., Inc., 802 F.2d 746, 753 (4th Cir. 1986) (holding that

evidence of a "general atmosphere of discrimination," harassment, or threats is "relevant to the

determinations of intent and pretext); but see Mattenson v. Baxter Healthcare Corp., ___ F.3d

___, 2006 U.S. App. LEXIS 4039, 2006 WL 387947 (7th Cir. Feb. 21, 2006) (holding that

"testimony about a work-place 'culture' as such is [not] admissible; it is too vague").

Defendants argue that the small number of remarks allegedly made by Clark were, even if

made, in no way related to the demotion or termination alleged to be discriminatory.  See Def's

Mem. at 14.  Moreover, Defendants argue, all but one of the alleged remarks did not even

concern Plaintiff, pertaining instead to Leverett Barr, a former employee who was terminated for

poor performance nearly a year before Plaintiff assumed the ASM role.  See id.  Defendants

maintain that Clark's alleged comment regarding Plaintiff that "the old guy still has it in him," is

obviously a statement indicating admiration, not derision, and certainly does not reflect the

stereotypical assumptions about the declining abilities of older workers that the ADEA was

designed to eradicate.  See Biggins, 507 U.S. at 610-11.  This remark, if it was actually made,

seems to indicate that Clark believed that Plaintiff's age had *not* adversely affected his job

performance.  It certainly does not "directly manifest[] a discriminatory attitude, of a sufficient

quantum and gravity that would allow the factfinder to conclude that attitude more likely than not

was a motivating factor in the employment decision."  Pasha, 2004 U.S. Dist. LEXIS 1226 at

*17-18, 2004 WL 188077.

Plaintiff also claims, however, that both Yerganian and Correll independently informed

him that Clark was targeting him for demotion and/or termination.  See id. at 17.  These alleged

communications included the charge that Clark had been "bragging" in the New Haven Branch

Office that he would have Plaintiff out of the Branch Manager job by July or August of 2001.

See id.  Although Plaintiff charges Clark with making these discriminatory comments, he

provides no admissible evidence to support his uncorroborated assertions, relying instead on

inadmissible hearsay.

As mentioned earlier, Plaintiff alleges that Clark commented that Barr, a former

Imagistics employee over the age of forty, had a "low energy level."  See Pl's Opp. at 2.  Courts

have generally held that remarks about an employee's "energy level" do not indicate age-based

animus, as an employee's level of energy—or lack thereof—is a legitimate business concern.

See Fortier v. Ameritech Mobile Communications, Inc., 161 F.3d 1106, 1113 (7th Cir. 1998)

(finding that statements such as needing "new blood" or an employee with a "lot of energy,"

standing alone, do not raise an inference of age discrimination).  Similarly, a review of relevant

case law indicates that other comments Clark allegedly made with regard to Barr—i.e., that he

was "set in his ways" and "did not have an incentive to work as hard"—also pertain to legitimate

business concerns and do not, without more, raise an inference of age discrimination.  See, e.g.,

Erickson, 271 F.3d at 724-25 (holding statements that the employee was "stale," "set in his

ways" and "needed a new focus" did not directly demonstrate age discrimination).

Although Plaintiff presents evidence of Clark's alleged "ageism," nowhere does he

present evidence that anyone at Imagistics made negative comments to him about his age or told

him that he was too old to work there.[20]  Plaintiff's allegations about Clark's ageism and the

discriminatory culture consist mainly of the vague statements discussed above and his assertion

that Correll characterized Clark's management style as "run[ning] the business like he was still

---

[20]        Comments allegedly made to or regarding other employees is not sufficient.  Plaintiff cannot rely
on inadmissible hearsay to create an issue of fact, nor can he rely on statements made about other
employees.  See Bailey v. Smythes, 295 F. Supp. 2d 344, 356-57 (S.D.N.Y. 2003) ("In the absence
of specific, admissible, evidence of facts bearing on Plaintiff's experience with [his employer],
other employees' allegations that their adverse employment experiences were the product of
discrimination are insufficient to rebut Defendants' proffered reasons for [the adverse employment
action].").  Plaintiff must prove that Defendants terminated *him* because of his age.

the captain of his college football team."  Pl's Opp. at 11.  These statements, although made by a decisionmaker, do not satisfy the other factors relied on by courts in assessing whether statements are probative of discriminatory intent.  Specifically, none of the alleged remarks were made in relation to the employment decision at issue (most did not even concern Plaintiff) or are alleged to have been made close in time to Plaintiff's demotion or termination.  It is unlikely that a reasonable juror could view the remark made about Plaintiff ("the old guy still has it in him") as discriminatory, and there is no evidence tying the alleged statements to the decision-making processes associated with Plaintiff's demotion and/or termination.  See Schreiber, 324 F. Supp. 2d at 518-19.  Two cases relied on by Plaintiff help to illustrate this point.

Plaintiff analogizes his case to Palasota v. Haggar Clothing Co., 342 F.3d 569 (5th Cir. 2003), a case in which the Fifth Circuit reinstated a jury verdict in favor of the plaintiff based on significant documentary evidence of ageism, including evidence flatly belying the employer's stated non-discriminatory reason for the plaintiff's discharge, and comments by the plaintiff's supervisor comparing younger workers to "race horses" and older workers to "plow horses," bemoaning the employer's "graying sales force," stating the need to "thin the ranks," and proposing a severance package for all workers "in their early fifties or older" shortly before all fourteen employees over the age of fifty who rejected the severance proposal, including the plaintiff, were discharged.  See Def's Reply at 5 (citing Palasota, 342 F.3d at 575-78).  Defendants argue that the facts in Palasota are "a far cry, both in terms of severity, frequency, and indicia of bias, from the innocuous, sporadic, and in one instance ('the old guy still has it in him') complimentary statements plaintiff attributes to Mr. Clark and ineffectively attempts to imbue with discriminatory animus."  Id.

38

Plaintiff also cites a case from the Third Circuit, <u>Fakete v. Aetna, Inc.</u>, 308 F.3d 335 (3d Cir. 2002), in support of his contention that Clark's comments are sufficient to create an issue for trial. This case, however, is based on quite different facts and is distinguishable. In a "serious one-on-one conversation" regarding the plaintiff's future with the company, his supervisor told him that "the new management [including the supervisor] . . . wouldn't be favorable to [the plaintiff] because they are looking for younger single people that will work unlimited hours and that [the plaintiff] wouldn't be happy there in the future." <u>Id</u>. at 336, 340. Following this exchange, the plaintiff's supervisor began issuing strong warnings alleging unexplained absences from the workplace and ultimately fired the plaintiff three months before his "substantial" pension would have vested. <u>Id</u>. at 336-337. In overturning the district court's grant of summary judgment, the Court relied on the facts that the supervisor's statements were made "about [the plaintiff's] prospects for continued employed with [the defendant company]" and that the supervisor "told [the plaintiff] unambiguously that [his supervisor] viewed him as a less desirable employee because of his age." The Court emphasized that this case was different from cases—such as the one at hand—in which statements "were made by a decisionmaker during conversations that had nothing to do with the plaintiff's job," where statements were "vague" or "ambiguous" and did not directly reference unlawful decisionmaking criteria, or where statements were merely "random office banter," all situations where summary judgment was properly granted in favor of the defendants. <u>Id</u>. at 339-340 (internal quotations and citations omitted).

### c. Defendants' Alleged Ageism in Hiring

Plaintiff also alleges, more generally, that Defendants are focused on hiring "young

people" and "recent college graduates," asking the Court to infer from this that he was demoted and terminated on account of his age.  In support of this assertion, Plaintiff alleges that Clark told him that Defendants wanted to hire salespeople in the twenty-five to thirty-five age range or recent college graduates.  See Compl. ¶ 10.  Although Plaintiff also asserts that Clark "recommended an ageist profile for hiring salespeople that is thoroughly outlined in his own affidavit," see Pl's Opp. at 3, this Court can find no evidence of an "ageist" hiring profile in Clark's Affidavit.  Clark's only reference to any kind of "hiring profile" was innocuous:

> I understand that [Plaintiff] claims I told him that Imagistics looks to hire college graduates for sales positions.  What I actually said was that most candidates for entry-level sales jobs are recent college graduates or are otherwise new to the workforce, which is in fact the case.  Entry-level sales positions at Imagistics are relatively low paying, offering an annual salary in the $20,000 range plus commissions, and therefore rarely prove attractive to experienced salespersons.  Age is not a factor I have ever considered in connection with any employment decision, whether it be hiring, discipline, promotions, discharge or something else.

Clark Aff. at ¶ 29.  Contrary to what Clark claims, Plaintiff alleges that Clark was very reticent to hire anyone, even "successful industry sales candidates," over the age of forty, but "consistently promoted" employees in their twenties and thirties even if they had poor performance levels. Pl's Opp. at 3.  The only evidence Plaintiff provides in support of this allegation is the fact that two forty year-old applicants were not aggressively pursued by Imagistics, even though he concedes that Imagistics ultimately agreed to hire both.  This weak evidence is insufficient to substantiate Plaintiff's claim that Defendants exhibited a "pattern or practice" of discriminatory hiring practices.  See Bliss v. Rochester City Sch. Dist., 196 F. Supp. 2d 314, 332 (W.D.N.Y. 2002) (holding that isolated acts are insufficient to demonstrate a pattern or practice of discrimination).

40

Plaintiff also submits a chart entitled "VP Age Analysis 1997 Through 2002." See Pl's Opp. at Exh. 15. This highly unscientific chart contains Plaintiff's estimates of various Vice Presidents' ages in 1997, 2000 and 2002, and purports to show that the average Vice President ages for 1997, 2000 and 2002 are 42.8, 33.3 and 33.3, respectively. Plaintiff alleges that his chart shows a pattern similar to the one he found in the National Directories, in which, according to Plaintiff, the Regional Vice Presidents were mostly forty years of age and older prior to 1996 but primarily in their twenties and thirties in 1999 and 2000. Even if the chart was based on accurate ages and not estimates, it is unlikely that it would be sufficient to show a pattern or practice of age discrimination. Moreover, Plaintiff provides no support for his allegation regarding Vice Presidents' ages at Imagistics nationally. Although "no bright line rule exists to guide courts in deciding whether a plaintiff's statistics raise an inference of discrimination," generally, statistics must, when combined with other evidence, be of a kind and degree sufficient to reveal (1) a statistical disparity that (2) is causally related to the challenged practice. Malave v. Potter, 320 F.3d 321, 325-26 (2d Cir. 2003). The fact that the ages are estimates, however, renders the chart too unreliable to be admissible as evidence of age discrimination. See Hoffman v. Applicators Sales and Serv., Inc., ___ F.3d ___, 2006 U.S. App. LEXIS 4164, 2006 WL 400143, at *4-5 (1st Cir. Feb. 22, 2006) (holding that the district court did not abuse its discretion in declining to consider, on summary judgment, a chart prepared by the ADEA plaintiff which purported to summarize the number of the defendant's employees over age fifty by division, but which was not properly authenticated, was based on data not properly authenticated or presented in the summary judgment record, was not a business record and the plaintiff had failed to identify the source of the facts and figures). Plaintiff cannot satisfy his burden of showing that Defendants

acted out of age-based animus simply by asking that the Court assume facts or rely on unsupported estimates that might support an inference of age discrimination.  See McCarthy, 202 F.3d at 165.

Moreover, the "rumors" and unsupported allegations relied on by Plaintiff in support of his contention that Clark was "reknowned [sic]" for promoting younger employees over older ones are insufficient to support an inference of unlawful discrimination.  Plaintiff's allegations are problematic because he relies, in large part, on hearsay from other current and former Imagistics employees (e.g., Dan Nagel, see Pl's Opp. at 11, Brian Correll, see Pl's Opp. at 11, 14, 17-18, Leverett Barr, see Pl's Opp. at 12, Craig Strassel, see Pl's Opp. at 14, and John Yerganian, see Pl's Opp. at 17-18), speculation about what "may have" occurred, see Pl's Opp. at 10-11, information as to what he "believes" occurred, see Pl's Opp. at 3, 18, 19 and "seriously suspects" occurred, see Pl's Opp. at 17, and on what he "interpreted" Clark's conduct to mean, see Pl's Opp. at 3, 14, 18.  See Def's Reply at 3 n.2.  See Patterson v. Cty. of Oneida, 375 F.3d 206, 219 (2d Cir. 2004) (explaining that "Rule 56(e)'s requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavit also means that an affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial").

Accordingly, because Plaintiff's evidence of the supposed youthful "profile" of defendants' new hires is unaccompanied by any empirical evidence, it necessarily carries no evidentiary weight.  See Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995) (a motion for summary judgment cannot be defeated solely "on the basis of conjecture or surmise" or "on conclusory statements" or "on contentions that the affidavits supporting the

motion are not credible").  Moreover, Clark's observation that the majority of Defendants' entry-level applicants tend to be recent college graduates or otherwise new to the workforce is not indicative of age-based animus.  See Pasha, 2004 U.S. Dist. LEXIS 1226 at *18, 2004 WL 188077 at *6 (holding that when a discrimination plaintiff's "statistical evidence only accounts for the ages of those individuals hired, while ignoring the ages of those individuals who applied for the position," the statistics, by themselves, "do not support an inference of age discrimination.") (citations omitted), aff'd 135 Fed. Appx. 489.  The Pasha court found that the plaintiff's supervisor's remark regarding "recruiting young people from the actuarial side of the company's business to become Investment Consultants" and the plaintiff's vague allegation that another supervisor said "something, I don't recall, we should be thinking of retiring at our age" were "too isolated and ambiguous" to support a finding of age discrimination.  See 2004 U.S. Dist. LEXIS 1226 at *14, 2004 WL 188077 at *5 (quoting Douglas v. Dist. Council 37 Municipal Employees' Educ. Fund Trust, 207 F. Supp. 2d 282, 291 (S.D.N.Y. 2002)).  In light of the legitimate business reasons for the comment, "[t]he fact that youth was mentioned" did not, in context and without more, "indicate an age bias."  Id.

Similarly, Defendants argue that Clark's reference to the age demographics of Imagistic's applicant pool does not suggest that he or the company preferred to hire younger workers over older ones or that he harbored an age bias.  Def's Mem. at 19.  Moreover, Defendants claim that Plaintiff has not been able to show that Imagistics regularly hires young, entry-level sales employees to replace more experienced sales managers, but admits that Imagistics invariably promotes from within the company.  Id.  Additionally, even if Plaintiff could prove that Imagistics had a youthful hiring profile, Defendants' hiring practices do not directly bear on the

question of whether Plaintiff's demotion and termination were discriminatory.  See Smith v. Leggett Wire Co., 220 F.3d 752, 762 (6th Cir. 2000) (holding that "the statistics relating to the percentage of minority supervisors at [defendant's] facilities were not relevant to the issue of whether [defendant] terminated [plaintiff] because of his race"); Zenni v. Hard Rock Cafe Int'l, 903 F. Supp. 644, 654 (S.D.N.Y. 1995) (holding that "statistical evidence of an employer's general hiring practices is insufficient to prove that a particular plaintiff was discriminated against").

### d.  Alleged Pattern of Replacing Older Workers with Younger Ones

Plaintiff attempts to bolster his age-discrimination claim with the allegation that the pressure on him was becoming more intense while the younger, lower-performing Boston Branch Manager, Darren Aizenman, remained "untouched."  Id.; see also Pl's Exh. 10.[21]  In addition to the evidentiary problems with this assertion, Plaintiff fails to show that he and Aizenmann were similarly situated, does not provide significant evidence regarding the Boston branch's performance and has no personal knowledge of Clark's relationship with Aizenmann.  See Defs' Reply at 7-8; Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000) (holding that plaintiffs in discrimination suits must show that they were "similarly situated in all material respects" to the individuals with whom they seek to compare themselves, including showing that they "were subject to the same performance evaluation and discipline standards" and "engaged in comparable conduct") (internal quotations and citations omitted).

---

[21]  Plaintiff's Exhibit 10 is a chart listing the revenue for June 2001 for all of the company offices. The chart shows the Hartford branch at 91.5 percent of its combined quotas and the Boston branch at 68.85 percent.  The Boston branch, however, had higher quotas than Plaintiff, with a $145,000 sold revenue quota and a $70,000 margin quota as compared to Plaintiff's $110,000 sold revenue quota and $55,000 margin quota.  The total revenue amounts in dollars were not much different, although the Hartford branch's were higher.

Plaintiff says that upon his termination, Brian Correll, the younger ASM in the Hartford branch, became the "acting Branch Manager." Pl's Opp. at 4, 10. It is not clear from the evidence presented whether Plaintiff was actually replaced, since Brian Correll and Plaintiff were both working in the Hartford branch as ASMs and Plaintiff was not serving as Branch Manager at the time of his termination. Plaintiff's contention that he was fired due to age discrimination would be "substantially undercut" if Defendants "never sought or hired a replacement" for him. See McCarthy, 202 F.3d at 165.

Even if Plaintiff was replaced, however, the general rule is that replacing an older worker with a younger one does not, in and of itself, prove unlawful discrimination. See Cousins v. Howell Corp., 113 F. Supp. 2d 262 (D. Conn. 2000); Fagan v. New York State Elec. & Gas Corp., 186 F.3d 127, 134 (2d Cir. 1999); accord Futrell v. J.I. Case, 38 F.3d 342, 348 (7th Cir. 1994) ("Typically, younger workers will replace older ones; this is an unremarkable phenomenon that does not, in and of itself, prove discrimination."). Defendants assert that when deposed, Plaintiff was able to identify less than ten employees forty years of age or older who, to the best of his knowledge, left Imagistics and were replaced by younger employees. See Def's Mem. at 19 (citing Pl's Depo. at 277-80, attached to Def's Mem. as Exh. A). Regarding those cases, Defendants claim that Plaintiff could offer "nothing other than speculation" regarding the circumstances surrounding the personnel changes cited. Id. Moreover, in his brief, Plaintiff refers to only three other employees, Leverett Barr, Ed Dequinzio and Sandy Navin, who he alleges were targeted for age-based discrimination, but provides no admissible evidence in support of his assertions. See Pl's Opp. at 10-11.

Plaintiff's statistics on this issue are inadequate without more development and in the

45

absence of any comparative data.  According to Defendants, "Imagistics employs several thousand workers of all ages," and therefore it is impossible to draw meaningful conclusions from the small sample provided by Plaintiff.  See Malave, 320 F.3d at 325-26 (2d Cir. 2003) (a discrimination plaintiff's statistics must, when combined with other evidence, be of a kind and degree sufficient to reveal a statistical disparity that is causally related to the challenged practice); see also Hayes, 343 F. Supp. 2d at 119 (finding that "the fact that 10 managers were terminated over a period of 3 years is not sufficient to constitute a statistical disparity"); Smith v. Xerox Corp., 196 F.3d 358, 365 (2d Cir. 1999) (reasoning that plaintiffs' statistical evidence on disparate impact claims had to be "of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group").

In conclusion, Plaintiff has failed to meet his burden of proving that Defendants intentionally discriminated on the basis of his age.  As discussed above, Plaintiff's burden cannot be met "through reliance on unsupported assertions," "on the basis of conjecture or surmise" or "on contentions that the affidavits supporting the motion are not credible."  Goenaga, 51 F.3d at 18.  Moreover, Plaintiff has not presented evidence sufficient to show that his age, specifically, was the reason for his demotion and termination.  Although Plaintiff may have been treated poorly, "[t]he ADEA does not make employers liable for doing stupid or even wicked things; it makes them liable for discriminating, for firing people on account of their age."  Norton, 145 F.3d at 120 (holding that "a jury cannot infer discrimination from thin air").  "In short, the several scraps of evidence on which the plaintiff's case depends do not sufficiently support the inference that the defendant acted by reason of the plaintiff's age."  McCarthy, 202 F.3d at 166.

**B. Retaliation**

Plaintiff's claim of retaliatory discharge is also analyzed under the three-part burden shifting analysis set forth in <u>McDonnell Douglas</u>, 411 U.S. 792.  To make a prima facie case of retaliation, Plaintiff must show by a preponderance of the evidence (1) that he participated in a protected activity known to Defendants; (2) the existence of an adverse employment action; and (3) a causal connection between the protected activity and the adverse employment action. <u>Slattery</u>, 248 F.3d at 94.  Again, a plaintiff's burden at this stage is de minimus.  <u>Id</u>.  Once Plaintiff has established a prima facie case, the burden shifts to Defendants to show that they had a legitimate, non-discriminatory reason for the adverse employment action.  <u>Id</u>. at 94-95.  If Defendants are able to make this showing, then the burden shifts back to Plaintiff to prove that the proffered reason is merely a pretext for unlawful discrimination.  <u>Id</u>. at 95.

The first two requirements for Plaintiff's prima facie case—i.e., protected activity and employer knowledge—are not at issue.  Accordingly, to determine whether Plaintiff has proved a prima facie case, we need only determine whether he has shown a causal connection between the protected activity and the adverse employment action.  Plaintiff alleges that "[a]lmost immediately after filing his discrimination claim, the defendants began retaliating against [him] in various ways including: threatening to demote [him] a second time to the position of Major Account Executive; placing [him] on an unusually strict performance improvement plan; removing the highest performing sales person [sic] from the plaintiff's team; and using a different way to document sales performance which made the plaintiff's sales numbers appear far lower than they actually were."  Compl. ¶ 13.

The first question here is whether the actions alleged to be retaliatory actually constituted

adverse employment actions.  The Second Circuit defines an "adverse employment action" as one in which a plaintiff endures a "materially adverse change in the terms and conditions of employment."  Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (internal citations omitted); see Williams v. R.H. Donnelley Corp., 368 F.3d 123, 128 (2d Cir. 2004).  For a change in working conditions to be "materially adverse," it must be "more disruptive than a mere inconvenience or an alteration of job responsibilities."  Id.  Employment actions that have been deemed sufficiently adverse include "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation."  Id. (ellipsis in original) (citations omitted).  Courts have generally held that negative performance evaluations with no "effect on the terms and conditions of . . . employment" (or, conversely, the lack of positive comments in an evaluation), "denying plaintiff assistance with . . . workload," "criticisms of [a plaintiff's] work performance," internal investigations, informal counseling and the relocation of a plaintiff's desk all do *not* constitute adverse employment actions.  See Sanders v. N.Y. City Human Res. Admin., 361 F.3d 749, 756 (2d Cir. 2004); Morrison v. Potter, 363 F. Supp. 2d 586, 591 (S.D.N.Y. 2005); Bond v. City of Middletown, 389 F. Supp. 2d 319, 331 (D. Conn. 2005); Radolf v. Univ. of Connecticut, 364 F. Supp. 2d 204, 224 (D. Conn. 2005); Johnson v. State of Connecticut, 392 F. Supp. 2d 326, 340 (D. Conn. 2005); Sioson v. Knights of Columbus, 160 F. Supp. 2d 316, 322 (D.Conn. 2001).

The actions alleged to be retaliatory in this case do not seem to constitute adverse employment actions and certainly do not fall within the classic examples of such actions. Plaintiff fails to present evidence sufficient to demonstrate that the acts complained of resulted in

a material change to his working conditions. Plaintiff's evidence also fails to suggest that he was demoted, terminated, transferred, reassigned or turned down for a promotion in retaliation for filing the CHRO and EEOC complaints.[22]

Even if Plaintiff were able to prove that he suffered an adverse employment action, he still must present evidence sufficient to show the requisite causal connection between any act alleged to be retaliatory and his participation in protected activity. Causation can be demonstrated "indirectly by showing that the protected activity was followed closely by discriminatory treatment," "through other evidence such as disparate treatment of fellow employees who engaged in similar conduct," or "directly through evidence of retaliatory animus directed against a plaintiff by the defendant." De Cintio v. Westchester County Medical Center, 821 F.2d 111, 115 (2d Cir. 1987) (internal citations omitted). Plaintiff's only basis for finding such a causal connection is time. Although temporal proximity may be sufficient to demonstrate a causal nexus, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." Slattery, 248 F.3d at 95.

1. Threats of Demotion

Plaintiff alleges that Clark's offers to demote him to an MAE position were made in retaliation for his protected actions. See Compl. ¶ 13. Plaintiff does not allege that he was actually demoted to an MAE position, but concedes that he remained at Imagistics as an ASM. Assuming that Plaintiff's allegations regarding Clark's threats are true, the mere threat to take

---

[22]     Plaintiff filed the complaints on December 14, 2001, *after* his alleged "demotion" to the ASM position and over a year and a half before his termination.

action does not, by itself, constitute an adverse employment action.  See Weeks v. New York State, 273 F.3d 76, 86 (2d Cir. 2001) (noting that a "notice of discipline" was not an adverse employment action).  Similarly, courts have held that "criticism of an employee . . . is not an adverse employment action," nor are "negative job evaluations."  Id.; see also Honey v. County of Rockland, 200 F. Supp. 2d 311, 320 (S.D.N.Y. 2002) ("reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions in the absence of other negative results such as a decrease in pay or being placed on probation").  The actions Plaintiff complains of were not accompanied by "a decrease in pay or being placed on probation," but were more like the "reprimands," "negative job evaluations" or at most, "threats of disciplinary action," discussed above.

In his affidavit, Clark claims that he suggested the MAE position to Plaintiff, who was "struggling to achieve quota," "in recognition of his lengthy tenure with Imagistics" and as a possible means of "reliev[ing him] of the responsibility of supervising other employees" so that he could "focus his attention squarely on selling."  Clark Aff. ¶ 15.  Clark's representations are supported by the fact that after Plaintiff turned down the MAE job, Clark offered it to Correll, the other, younger ASM in the Hartford branch, who accepted the position.

## 2. "Strict" Performance Improvement Plan

Similarly, Plaintiff's allegation that he was placed on "an unusually strict performance improvement plan" does not constitute a cognizable adverse employment action.  The performance improvement plan has not been shown to have affected Plaintiff's salary, commissions, bonus eligibility or benefits.  To the contrary, it seems, from the evidence presented, that the purpose of the plan was to provide Plaintiff an opportunity to return to his

former position at Branch Manager if the quotas were met.  Even if the plan was strict, however, it is clear that "criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action." Weeks, 273 F.3d at 86 (citation omitted).

Moreover, Plaintiff's performance improvement plan does not appear to have been something new; rather, it was a continuation of warnings, counseling sessions, and performance improvement plans that began in July of 2000 and continued until his termination.  Such conduct does not raise an inference of retaliation.  The Second Circuit has held that when allegedly adverse actions were "both part, and the ultimate product of an extensive period of progressive discipline" beginning *before* the Plaintiff engaged in the protected activity and where "timing is the only basis for a claim of retaliation," "an inference of retaliation does not arise."  Slattery, 248 F.3d at 95; accord Walker v. Access Agency, 2004 U.S. Dist. LEXIS 19624, at *24, 2004 WL 2216526, at *7 (D. Conn. Aug. 31, 2004).

### 3.  Removal of Salesperson from Plaintiff's Team

Although Plaintiff alleges that Correll was removed from his team, he fails to allege how this could constitute an adverse employment action, as there appears to be no earnings loss or other tangible detriment associated with the removal.  The mere fact of Correll being removed from Plaintiff's team is not sufficient to constitute an adverse employment action.  See Mitchell v. Vanderbilt Univ., 389 F.3d 177, 182 (6th Cir. 2004) (holding that plaintiff's "allegations that [the defendant] deprived him of a graduate research assistant during one summer [and] revoked his mentor status in the M.D./Ph.D graduate program" did "not amount to adverse employment actions"); Augustus v. Metro Channels L.L.C., 2002 U.S. Dist. LEXIS 9466, at *, 2002 WL

1033141, at *9 (S.D.N.Y. May 15, 2002) (holding that "unequal access to . . . an intern does not establish a materially adverse change in the terms and conditions of employment"), *adopted in relevant part*, 217 F. Supp. 2d 458 (S.D.N.Y. 2002).

Moreover, the undisputed facts suggest that Correll was "removed" from Plaintiff's team not in retaliation for his protected activity but as a consequence of the fact that Plaintiff was working as an ASM and not as a Branch Manager.  Plaintiff's acceptance of the ASM position in September 2001—several months before Plaintiff filed his CHRO and EEOC complaints—terminated Correll's reporting relationship with Plaintiff.  When Correll accepted the MAE position in January 2002, however, his three CAEs were reassigned to Plaintiff's team, seemingly a benefit to Plaintiff.  Plaintiff cannot charge Defendants with retaliating against him on the basis of actions that had been taken prior to his engaging in the protected activity.  See, e.g., Slattery, 248 F.3d at 95.

Plaintiff additionally alleges that Clark agreed to credit Correll's sales to Plaintiff's team but reneged on the offer after receiving a fax from Plaintiff accusing him of age discrimination. Plaintiff concludes, based on the close temporal relationship of the two activities, that Clark's change of heart was retaliatory.  Even if this constituted an adverse employment action, Defendants have produced evidence going to show that Clark entered into the initial agreement without consulting with his boss and that his boss refused to approve the arrangement on the basis that it would be "unfair."  Clark asserts that when he consulted with his boss, he did not tell him about Plaintiff's e-mail accusing Clark of age discrimination.  Clark Aff. ¶ 20.  Moreover, when Correll moved back into an ASM role, Clark agreed to assign him to Plaintiff's team on the condition that Plaintiff achieve 100 percent of year-to-date quota with at least sales

representatives at or above goal.  See Pl's Depo., Exh. 34; Clark Aff. ¶ 23.  Clark followed

through on this commitment even though Plaintiff failed to fully satisfy the conditions of the

offer.  See Pl's Depo. at 334-35 & Exh. 35; Clark Aff. ¶ 24.  Without an offer of further proof of

retaliatory motive by Plaintiff, the Court cannot, on these facts, find that the alleged acts were

done in retaliation for Plaintiff's protected activity.

4.  Documentation of Sales Production

Lastly, Plaintiff alleges that Defendants "us[ed] a different way to document sales

performance which made [his] numbers appear far lower than they actually were."  Compl. ¶ 13.

For an employment action to be sufficient adverse, "there must be a link between the

discrimination and some tangible job benefits such as compensation, terms, conditions or

privileges of employment."  Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002).  There does

not appear to be any such link here.

The parties' contentions on this issue are difficult to decipher, but Plaintiff generally

alleges that in July 2001, Clark began harassing him with memoranda detailing his teams lack of

production although he claims to have been at 104 percent of quota for the preceding ten months.

Plaintiff goes on to claim that this harassment contributed to a further decline in his sales, which

eventually culminated in his removal from the position of Branch Manager and demotion to the

ASM position.  See Pl's Opp. at 16; Pl's Exh. 19.  Defendants, on the other hand, assert that

because Imagistics measures performance on a monthly and calendar year basis rather than "on

the basis of productivity during some random period of time, such as ten (10) months," it was

Plaintiff, not Defendants, who is "guilty of gerrymandering the numbers."  Defs' Mem. at 28.

Although Plaintiff's claim that he was at 104 percent of quota for the preceding ten months is

undisputed here, it is also clear that when Clark wrote the memorandum in July 2001, the

Hartford Branch had, in the month of July, only "generated $41,489.00 in revenue, putting it at

38% quota and dropping year-to-date performance below 75%." See Defs' Reply at 7 (quoting

Defs' Rule 56(a) Statement at ¶ 14).  Due to the fact that Defendants have shown Plaintiff's

performance in July to be sub-par, it does not appear that the memo was written with a retaliatory

or discriminatory motive.  Moreover, Plaintiff has presented no evidence suggesting that Clark

was treating him any differently from younger, similarly situated Branch Managers and ASMs in

the Northeast Region.  Graham, 230 F.3d at 40 (holding that plaintiffs in discrimination suits

must show that they were "similarly situated in all material respects" to the individuals with

whom they seek to compare themselves, including showing that they "were subject to the same

performance evaluation and discipline standards" and "engaged in comparable conduct")

(internal quotations and citations omitted).  Finally, Plaintiff again does not allege that this

behavior began or worsened after he engaged in the protected actions; rather, it again seems that

the any adverse behavior began *before* the filing of the CHRO and EEOC complaints, erasing

any presumption that the acts were retaliatory.

Viewing all factual ambiguities in Plaintiff's favor, the court finds that Plaintiff fails to

establish a prima facie case of retaliation because Plaintiff has not demonstrated that the alleged

actions constitute cognizable adverse employment actions and there is no evidence of a causal

connection between the filing of the CHRO and EEOC complaints and the subsequent alleged

adverse employment actions.

**V.  CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. No. 34] is

**granted**.  The Clerk shall close the case.

SO ORDERED.

Dated at New Haven, Connecticut, March  21 , 2006.

_____ /s/ _____
Peter C. Dorsey, U.S. District Judge
United States District Court